UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN MICHAEL SHERWOOD,<br><br>　　　　　　　　　Defendant. | CASE NO. CR22-0127JLR<br><br>ORDER |

## I.　INTRODUCTION

Before the court is Defendant John Michael Sherwood's motion for a new trial. (Mot. (Dkt. # 151).) Plaintiff the United States of America (the "Government") opposes the motion. (Resp. (Dkt. # 153).) The court has considered the parties' submissions, the relevant portions of the record, and the governing law. Being fully advised, the court DENIES the motion.

//

//

## II. BACKRGOUND

In the spring of 2021, law enforcement recovered distribution-level quantities of methamphetamine and fentanyl from duffel bags located on a beach outside of Port Angeles, Washington. On August 24, 2022, a grand jury indicted Mr. Sherwood and two co-defendants in connection with a failed attempt to smuggle those drugs from the United States into Canada. (*See* Indictment (Dkt. # 1).) Mr. Sherwood proceeded to trial on three charges: (1) conspiracy to distribute controlled substances; (2) possession of a controlled substance with intent to distribute; and (3) conspiracy to commit international money laundering. (*See id.* at 1-3.)

Trial began on July 19, 2024. (7/19/24 Min. Entry (Dkt. # 108).) On the fifth trial day, Mr. Sherwood took the stand. (7/25/24 Min. Entry (Dkt. # 133).) Throughout his direct examination, Mr. Sherwood often gave meandering, non-responsive answers to defense counsel's questions, prompting numerous objections that the court sustained. Near the end of his testimony, Mr. Sherwood admitted to perjuring himself on the stand in a prior criminal case. When defense counsel asked Mr. Sherwood why he was not lying on the stand in this case, Mr. Sherwood stated that he is facing a life sentence. The Government swiftly objected on the basis of non-responsiveness, which the court sustained. The court then commented as follows:

> [Defense] [c]ounsel, you're an experienced lawyer, there's an instruction that we give that says sentences are up to the judge. . . . [T]he jury decide[s] the facts. Those facts are convictions or a finding of not guilty. There is absolutely no reason why we are discussing the length of the sentence, and the defendant is seriously out of his league if he's trying to say he's a lawyer and he understands all of this. It's inappropriate, the jury will disregard it, and please ask a question. I'm not criticizing you because you asked a

>question which your client is volunteering information to that's unresponsive in an attempt to convince the jury of something. I'm not going to tolerate it in this courtroom.
>
>Ladies and gentlemen, disregard that answer, ask a new question, and let's try and get it finished up by lunch.

(7/25/24 Rough Tr.[1] at 116:11-24; *see also* Final Jury Instr. (Dkt. # 134) at 36 ("The punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.").) Trial concluded the following day, and the jury returned a verdict of guilty on all counts. (7/26/24 Min. Entry (Dkt. # 135); Verdict (Dkt. ## 139 (sealed), 140 (redacted)).)

Mr. Sherwood now moves for a new trial in the interest of justice pursuant to Federal Rule of Criminal Procedure 33(a), arguing the court at some point "angrily directed Mr. Sherwood to answer only the question asked" and therefore "gave at least some jurors the impression" that the court believed "Mr. Sherwood was fabricating his testimony." (Mot. at 1-2 (citing *United States v. Fernandez*, 480 F.2d 726, 737-38 (2d Cir. 1973)).) The motion is now ripe for decision.

### III.   ANALYSIS

The court begins by noting that Mr. Sherwood does not identify the particular comment that he claims was prejudical (*see generally* Mot.), and as a result the court is left to guess at the subject of his motion. Based on the court's recollection of trial and its review of the rough transcript, the above-quoted comment reflects the only occasion

---

[1] Relevant pages of the rough trial transcript for July 25, 2024, are attached hereto as Appendix A.

ORDER - 3

throughout Mr. Sherwood's testimony that could reasonably have been perceived as drawing the ire of the court. The court therefore proceeds to consider whether the above-quoted comment warrants a new trial.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). It is within the trial court's discretion to grant such a motion, and the court should do so only "in exceptional circumstances in which the evidence weighs heavily against the verdict." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012). The Ninth Circuit "will reverse a trial court for excessive judicial intervention only in cases of actual bias . . . or if the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality, and the alleged misconduct had a prejudicial effect on the trial." *United States v. Kahre*, 737 F.3d 554, 579 (9th Cir. 2013) (quoting *United States v. Scott*, 642 F.3d 791, 799 (9th Cir. 2011)). A jury verdict will not be overturned based on the trial judge's conduct unless it "appear[s] that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party." *Id.* (quoting *Scott*, 642 F.3d at 299). The court must make this assessment "in light of the evidence of guilt." *Id.* (quoting *Scott*, 642 F.3d at 299).

To begin, the court's comment came near the conclusion of Mr. Sherwood's testimony, after he had already established a pattern of long, winding, narrative answers in which he continuously volunteered irrelevant information and/or failed to respond to the question asked. Mr. Sherwood persisted in this fashion despite numerous sustained objections and warnings. When Mr. Sherwood proceeded to volunteer information about

his potential punishment, the Government unsurprisingly objected and the court properly sustained that objection. The court's subsequent comment was both appropriate and necessary to cure Mr. Sherwood's error in attempting to engender the jury's sympathy by discussing his potential life sentence. *See United States v. Lynch*, 903 F.3d 1061, 1080 (9th Cir. 2018) ("It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed." (cleaned up)).

To the extent the court's tone could have been perceived as angry, a new trial still would not be warranted. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (stating "[a] judge's ordinary efforts at courtroom administration" including "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality); *see Scott*, 642 F.3d at 799 (affirming denial of new trial where the trial judge "admonished defense counsel over a hundred times during the course of a week-long trial," and those "comments and interventions were inconsistent with standards of judicial decorum"); *cf. Fernandez*, 480 F.2d at 737-38 & n.19 (remanding for new trial where the trial judge made "repeated, lengthy and occasionally angry interventions" during a defense expert's testimony, including by asking 112 questions on cross-examination as compared to the prosecutor's 133 questions). Even assuming the court's comment impressed upon the jury "that Mr. Sherwood was fabricating his testimony" (Mot. at 2), any resulting prejudice was negated by: (1) Mr. Sherwood's own testimony that he perjured himself on the stand in a prior criminal case, and (2) final jury instruction number one (*see* Final Jury Instr. at 2 ("Please do not read into these instructions or into

anything I may have said or done as any suggestion as to what verdict you should return—that is a matter entirely up to you.")).

Furthermore, to say the evidence of guilt was overwhelming would be an understatement. The jury's verdict was supported by testimony of two key eyewitnesses (Carol Stuart and Mr. Sherwood's co-defendant, Erika Bocelle), extensive phone records (including photographs, text messages, cellphone location data, and a jail call), surveillance photographs and video footage, business records (including shopping receipts), and physical evidence of the seized methamphetamine, fentanyl, duffle bags (which contained unique bar codes matching Mr. Sherwood's shopping receipts), and an inflatable raft by which Mr. Sherwood attempted to transport the drugs across the Strait of Juan de Fuca. Mr. Sherwood even took the stand and admitted to the international money laundering charge, and more or less admitted to the drug charges (though Mr. Sherwood insisted he attempted to smuggle only marijuana, rather than methamphetamine and fentanyl). Accordingly, this case does not present "exceptional circumstances in which the evidence weighs heavily against the verdict" so as to warrant a new trial. *Del Toro-Barboza*, 673 F.3d at 1153.

## IV.   CONCLUSION

For the foregoing reasons, the court DENIES Mr. Sherwood's motion for a new trial (Dkt. # 151).

Dated this 29th day of August, 2024.

JAMES L. ROBART
United States District Judge

# Appendix A

```
 1                REALTIME UNEDITED TRANSCRIPT
 2                       ROUGH DRAFT
 3                    (Jury not present.)
 4          THE CLERK:  Please rise.
 5      The United States District Court for the Western District
 6  of Washington is now in session, the Honorable James L. Robart
 7  presiding.
 8          THE COURT:  Please be seated.
 9      Counsel, my notes suggest that you had an evidence question
10  that you wanted to raise first.
11          MR. SANTIAGO:  Yes, Your Honor.
12      In conversations with the government, I asked them
13  yesterday to make the raft that was brought into evidence, and
14  the bags, the bags that contained the methamphetamines -- not
15  the actual drugs, but the bags that contain the
16  methamphetamines -- I asked the government to make those
17  available to me for my summation.  And the government took issue
18  with that and objected to that, so that's the conversation.
19          THE COURT:  The rule in the Ninth Circuit is that I am
20  to guard carefully against undue emphasis on any particular
21  piece of evidence.  It's why they discourage read-backs.
22          MR. SANTIAGO:  That's why they discourage what?
23          THE COURT:  Read-backs of testimony.
24      And the rationale is that it will call out a particular
25  piece of evidence for somehow greater importance in the case.
```

1  to stay straight.  First four months, I did real good.  And
2  everything was shut down because of COVID-19; Walgreens turned
3  off the contract.
4  Q.   So I'm going to ask about that.  You had the -- had you the
5  person who might be able to get you weed, but you're a smug her
6  so did you have a person you could give the weed to yet at that
7  time?
8  A.   I -- the coolers that I was telling you about we took out
9  there.  I got a phone call from an individual that owns
10 dispensaries in Massachusetts, marijuana is legal in
11 Massachusetts and he bought a three door -- at that time it was
12 one three door cooler for his dispensary.  He came out to my
13 warehouse and decided he wanted one for each one of his stores,
14 all right.  When I delivered the cooler to his main store where
15 he spent most of his day, he was the operational supervisor of
16 that store, uhm, I delivered it there and, uhm, he actually seen
17 a tattoo on my arm and said you been in jail before, you been in
18 jail is that a jail tattoo?  I said, yeah, that's an old jail
19 tattoo, you know, and, uhm, I says, is ate concern that I was in
20 jail, you know, forward that I says I took a little offense to
21 it okay I'm not a lot of offense I took a little offense and I
22 said I just did 15 years in prison for everything you're selling
23 here under the spot I don't know if anybody's ever been in a
24 dispensary but I was just amazed and shocked at how they display
25 this marijuana now, you can walk in from the street and buy it.

```
 1              MR. LOMBARDI:  Your Honor, I would object.  This is
 2   narrative.
 3              THE COURT:  Ladies and gentlemen, we're being driven
 4   down a rabbit hole here.  You know what the issues are in this
 5   case.
 6         Counsel, please ask questions.  Don't lead, because you are
 7   right now.  And let's stay germane, as opposed to a discussion
 8   of what the marijuana looks like in a dispensary in
 9   Massachusetts.
10              THE WITNESS:  I'm sorry, Your Honor.
11              THE COURT:  Let's start with a fresh question.
12   BY MR. SANTIAGO:
13   Q.    Okay.  So after you had Gartry on one side and the
14   dispensary guy in Massachusetts on the other side, what did you
15   do?
16   A.    Dispensary guy asked me if I could get him any weed.  And
17   at that time I said -- at that time, this is in December of
18   2020, I told him, listen, the feds made a believer out of me, I
19   just did the 15 years for the weed, and I wasn't interested in
20   it, okay.  I said, I didn't know anybody, I was out of that
21   business and stuff like that.  He said, well, if you could ever
22   get me any weed, he says -- he says, there are -- the prices I
23   pay for it and the taxes and all that other stuff, I'd be
24   interested in purchasing some weed from you, so I'll keep you in
25   mind.
```

1   A.   Kevin Gartry.

2   Q.   Okay.  And was there any reason why Kevin Gartry told you

3   to pick that room?

4   A.   He was very familiar with the motel.

5   Q.   Okay.  How was he familiar with it?

6   A.   Through the smuggling operations.  I guess people that he

7   had coming up there or maybe even himself had stayed there

8   himself.  He had a -- when I rented the room at the motel, while

9   I was talking to Kevin, I don't know if I was talking to Kevin

10  Gartry or his brother Joseph Gartry, but what room are you in

11  and that and I had made a joke with him or -- not necessarily a

12  joke, you know, but I told him I said hay look I'm in, we're

13  comfortable, set up in a room, going to get some beer you know

14  send a couple ladies down to the room and all that and since I

15  got the room for the night and that -- what room number are you

16  in I said room number 8.  I told him I was in room number 8.

17  Uhm, and I can't swear whether it was Kevin or his brother

18  Joseph because I'm talking to all three of 'em or both of them

19  -- three of us are talking pretty much at the same time and

20  that.  And why I went down to the.

21          THE COURT:  Counsel at this point we're into a

22  narrative it seems to have marginal relevance to this.  Please

23  ask specific questions.

24  A.   I'm sorry Your Honor.

25          THE COURT:  Don't interrupt me, ask specific questions

1  they were on the way to pick it up, they were already on the way
2  I said I'm at the gas stays.  You're good, we're good to good,
3  we're good we'll let you know everything is good.  I said well
4  I'm going back to the motel room and I'll wait for you back
5  there I'll wait to hear from you back there and that's what I
6  did, I went back to the motel room.
7  Q.   Okay.  And to the best of your knowledge, did Gartry
8  receive that equipment?
9  A.   We spoke on the phone and he said, everything good, we got
10 the equipment everything went well, and uhm, chill out.  Let's
11 get everything together and and and uhm now we got the radios,
12 so let's play with the radios a little bit.
13      At the time that I received that message from him, I didn't
14 actually immediately go out and play with the radios okay but it
15 was short time after that I took my radio and I went out I
16 didn't go back to the beach, but I went out to -- out to like
17 101 past that gas station and that and that so I can test the
18 radio and stuff like that and everything worked.  We were -- we
19 were on the same channel, go to channel 4, go to channel
20 whatever.
21          MR. LOMBARDI:  Your Honor, this is now narrative;
22 objection.
23          THE COURT:  It is.
24          THE WITNESS:  I'm sorry.
25 BY MR. SANTIAGO:

```
 1  Q.    When you say play with the radio, do you mean --
 2              THE COURT:  Counsel --
 3  BY MR. SANTIAGO:
 4  Q.    What do you mean by that?
 5              THE COURT:  Thank you.
 6  A.    To follow his instructions to go to I'm going the say
 7  channel 4 I don't know that's what he actually said channel 4 to
 8  go to channel 4 and then be able to key the radio in and say do
 9  you read me, okay, and he'd come back with, Gartry knows all the
10  signal codes 10-4, 10-10, that's what he come back with, 10-10,
11  I read you loud and clear.
12              MR. LOMBARDI:  Your Honor, I'm going to object.  This
13  is narrative again.
14              THE WITNESS:  I'm sorry.
15              THE COURT:  Sustained.
16       Ladies and gentlemen, please disregard the testimony.
17  BY MR. SANTIAGO:
18  Q.    When you said test the radios, are you testing them --
19              MR. LOMBARDI:  I'm also now going to object that this
20  is cumulative.  And I'm not sure it's relevant at this point.
21  BY MR. SANTIAGO:
22  Q.    Are you --
23              THE COURT:  I'll permit the question, but let's move
24  on, Counsel.
25  ///
```

| | |
|---|---|
| 1 | Q. And that's when you're testing the comes? |
| 2 | A. Yes, the afternoon of April the 9th. |
| 3 | Q. All right. Now when you do this raft exchange, is Erika |
| 4 | with you? |
| 5 | A. No, she's not. |
| 6 | Q. All right. Do you eventually go back to the hotel? |
| 7 | A. I do. |
| 8 | Q. Okay. And what other communications with Gartry do you |
| 9 | have after that, if any? |
| 10 | A. That he receive you know they receive the equipment and |
| 11 | everything was good, they like the choices that I made and their |
| 12 | clothing attire and and the stuff that I purchased. Uhm, he |
| 13 | thanked me for picking up the equipment and stuff like that, |
| 14 | said standby, let me get everything together here and that, but |
| 15 | since we got our radio equipment up and running, our |
| 16 | surveillance set up and running, he says John there's a lot of |
| 17 | heat going on in this area here and all that, let's see |
| 18 | what's -- what's -- what's going on. This is -- like I say, |
| 19 | this is -- we're into -- |
| 20 | MR. LOMBARDI: Objection, beyond the scope, now |
| 21 | narrative. |
| 22 | THE COURT: Agreed. |
| 23 | BY MR. SANTIAGO: |
| 24 | Q. Were you able to get the hundred pounds of marijuana that |
| 25 | you were trying the get at this time yet? |

```
 1  it to Sacramento to U-Haul in Sacramento.
 2  Q.    If you're aware, did Erika ever return that van to
 3  Sacramento?
 4  A.    I'm very aware that she did not.
 5          MR. LOMBARDI:  Objection.
 6  BY MR. SANTIAGO:
 7  Q.    How are you aware?
 8  A.    Well, it cost me $7,400 that she didn't turn that there,
 9  and then eventually I got the -- I say cost me, they billed me
10  $7,400 because it wasn't returned back to Sacramento.
11          MR. LOMBARDI:  Your Honor this is narrative it's also
12  dubious relevance at this time.
13          THE COURT:  I'll sustain the objection as to far ray
14  activity.  I'll overrule it as to relevance let's ask a fresh
15  question and a precise one.
16  A.    Could you ask.
17  Q.    Did you ever become aware of where Erika returned the van?
18  A.    Yes, I did, I got received a phone call from U-Haul telling
19  me that they tried to charge my card I believe the $7,400 and it
20  wouldn't go through and I said $7,400, are you out of your mind.
21  They said the van was returned.
22          MR. LOMBARDI:  Objection, Your Honor this is all
23  hearsay.
24  A.    Oh I'm sorry.
25          THE COURT:  Sustained.
```

```
 1  BY MR. SANTIAGO:
 2  Q.   Where did you learn the van was returned, the U-Haul van
 3  was returned?
 4  A.   I received phone call from U-Haul.
 5  Q.   Where was the van returned?
 6  A.   To U-Haul in Missoula, Montana.
 7  Q.   Now, you had just -- this was going on -- and this was
 8  going on while you were getting the pickup truck?
 9  A.   No, I had already purchased the pickup truck when I
10  received that.
11  Q.   And you took the pickup truck where?
12  A.   Well, I left Port Angeles Washington, okay, and I went to
13  Spokane, Washington first, and to the truck stop in Spokane,
14  okay.  Because communication between Gartry and I at this time
15  was he -- they weren't sure that they could bring -- get the
16  marijuana, get across country from where they were in that part
17  of Canada to the part of Canada up near north port Washington in
18  time.  And actually I believe his intentions at the time --
19           THE COURT:  Counsel, stop.
20  A.   I'm sorry.
21           THE COURT:  You're not answering the questions that
22  are asked, you're volunteering information that's not relevant.
23  It needs to stop.
24  A.   All right.  Sorry.
25           THE COURT:  Answer his questions, he's not going to
```

```
 1   situation but he would come back quickly okay.  I believe he
 2   called the police, okay.  The Montana Highway Patrol.  And, uhm,
 3   said that you know there had to be a report mated made on this
 4   and all that.  So he left, I was there with the vehicle.  State
 5   police showed up and made the report.  Eventually the tow truck
 6   driver came back, hooked the vehicle up, towed the truck.
 7   Q.   Was the truck able to get fixed?
 8   A.   Yes it was, we towed it to.
 9   Q.   After the truck got fixed, where did you go?
10   A.   Well, while they were fixing the truck, I went -- I rent a
11   motel room in the town of --
12           MR. LOMBARDI:  Objection, nonresponsive.
13           THE COURT:  Sustained.
14   BY MR. SANTIAGO:
15   Q.   After the truck got fixed, where did you go?
16   A.   After the truck got fixed?
17   Q.   Correct?
18   A.   To Rhode Island.
19   Q.   Okay.  How did you go to Rhode Island?
20   A.   I drove the truck.
21   Q.   What highway did you take?
22   A.   90.
23   Q.   Straight to Rhode Island?
24   A.   Straight to Rhode Island.
25   Q.   Okay.  I'd like to show you what's been entered into
```

```
 1  whole explanation that we just sat through.
 2  BY MR. SANTIAGO:
 3  Q.    Is there a reason why you're not lying here today?
 4  A.    Let's see.  The facts of the case will show that I'm not
 5  lying here today, okay, uhm.  I made -- the marijuana that I was
 6  arrested for, okay, I never dreamed that I would receive a
 7  10-year sentence on it, okay.  This sentence here is a life
 8  sentence for me.
 9           MR. LOMBARDI:  Objection, Your Honor, this is not
10  responsive.
11           THE COURT:  Counsel, you're an experienced lawyer,
12  there's an instruction that we give that says sentences are up
13  to the judge.  Ladies and gentlemen of the jury decide the
14  facts.  Those facts are convictions or a finding of not guilty.
15  There is absolutely no reason why we are discussing the length
16  of the sentence, and the defendant is seriously out of his
17  league if he's trying to say he's a lawyer and he understands
18  all of this.  It's inappropriate, the jury will disregard it,
19  and please ask a question.  I'm not criticizing you because you
20  asked a question which your client is volunteering information
21  to that's unresponsive in an attempt to convince the jury of
22  something.  I'm not going to tolerate it in this courtroom.
23         Ladies and gentlemen, disregard that answer, ask a new
24  question, and let's try and get it finished up by lunch.
25  ///
```